[Cite as *State v. Richter*, 2026-Ohio-2386.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                      Court of Appeals No.  {48}L-25-00008

     Appellee                              Trial Court No.  CR0202401258

v.

Arthur N. Richter                              **DECISION AND JUDGMENT**

     Appellant                             Decided:  June 23, 2026

\* \* \* \* \*

Julia R. Bates, Lucas County Prosecuting Attorney, and
Randy L. Meyer, Assistant Prosecuting Attorney, for appellee.

Joseph Sobecki, for appellant.

\* \* \* \* \*

**OSOWIK, P.J.**

{¶ 1} This is an appeal of a November 6, 2024 judgment of the Lucas County

Court of Common Pleas, finding appellant guilty on one count of aggravated arson, in

violation of R.C. 2909.02, a felony of the first degree, and one count of felonious assault,

in violation of R.C. 2903.11, a felony of the second degree.  Appellant was acquitted on a

second count of aggravated arson, the convictions were merged for sentencing, and

appellant was sentenced to a term of incarceration ranging from a minimum term of eight

years, to a maximum term of 12 years. For the reasons set forth below, this court affirms the judgment of the trial court.

*Case Background*

{¶ 2} The following facts are derived from the record of evidence. This case stems from a February 12, 2024 random encounter between Arthur Richter, appellant, and two friends, D.T. and R.T., the victims in this case.

{¶ 3} On the afternoon of Saturday, February 12, R.T. and D.T. were driving through Toledo, en route from D.T.'s home in Point Place to a nearby home to attend a cookout. R.T. was driving, while D.T. was seated in the front passenger seat. While stopped at a red light on Summit St., the pair first encountered appellant, a pedestrian on Summit St., who was previously unknown to them.

{¶ 4} Appellant, who later claimed to have been searching for a homeless man to give him a blowtorch to stay warm at the time that he first observed the victims, approached the car of the unknown men, and inexplicably pressed the lit blowtorch against their window.

*Victims Proceed to Nearby Gas Station*

{¶ 5} Following the unsettling encounter, R.T. and D.T. went to a nearby gas station. R.T. parked at a gas pump, intending to refuel the vehicle. While walking into the service station to purchase a beverage, D.T. observed appellant approaching, walking through the gas station parking lot. Concerned that the individual brandishing a lit blowtorch, whom they had just encountered, was now at the gas station, D.T. and R.T.

2.

immediately warned a delivery driver standing nearby, Mohammad Rahman, who was also outside at the gas station, to be aware of the approaching, "guy with a blowtorch".

*Appellant Uses Blowtorch Against D.T.'s Person*

{¶ 6} As clearly shown in the gas station surveillance camera video footage of the incident, appellant next positioned himself inside the gas station entry door, blocking it and holding the door, as D.T. approached. As D.T. arrived at the entry door, appellant abruptly threw the door open, rushed D.T., and thrust the lit blowtorch directly into D.T.'s face. As D.T. turned around and attempted to flee, appellant pursued D.T. with the lit blowtorch, and put it against the back of D.T.'s hair, setting a portion of D.T.'s hair on fire, as witnessed by Rahman.

{¶ 7} As these events were unfolding, Arianna Hogan, an off-duty cashier present inside the store for scheduling discussions with the store manager, observed the events, called 9-1-1, and reported appellant's blowtorch attack. In conjunction, R.T., who lawfully possessed a firearm, pointed his firearm at appellant in an effort to get appellant to cease the ongoing attack upon D.T.

{¶ 8} Prior to the arrival of law enforcement, appellant once again aggressively approached D.T. and R.T., brandishing the lit blowtorch directly towards them, and then held the lit torch against a bundle of firewood displayed for sale just outside of the gas station entry door, singeing it.

{¶ 9} Upon the arrival of law enforcement, and appellant being handcuffed and placed in the rear of the police vehicle, both body cam and dash cam video footage

3.

captured appellant virulently spouting a barrage of physical threats and racial epithets at D.T. and R.T.

*Indictment*

{¶ 10} On February 20, 2024, as a result of the foregoing events, appellant was indicted on one count of aggravated arson, as relates to D.T.'s person, in violation of R.C. 2909.02(A)(1), a felony of the first degree, one count of aggravated arson, as relates to the gas station structure, in violation of R.C. 2909.02(A)(2), a felony of the second degree, and one count of felonious assault, in violation of R.C. 2903.11(A)(2), a felony of the second degree.

*Jury Trial, Conviction, and Sentence*

{¶ 11} On November 5, 2024, a two-day jury trial commenced. The State presented the testimony of the three principal eyewitnesses present at the gas station during the events; Mohammad Rahman, the delivery driver, Arianna Hogan, the off-duty cashier who called 9-1-1, and Christine Celestino, a customer. The State further presented the testimony of Kathryn Brown, the city of Toledo arson investigator who filed the charges, Officer Donald O'Brien, the officer who responded to the 9-1-1 call, and the testimony of the victims, D.T. and R.T. Lastly, appellant testified at length on his own behalf.

{¶ 12} Following jury deliberations, appellant was found guilty of the first count of aggravated arson, pertaining to D.T.'s person, and the third count of felonious assault, and was acquitted of the second count of aggravated arson, pertaining to the gas station

4.

structure. The convictions were merged as allied offenses for sentencing purposes, and appellant was sentenced to a term of incarceration ranging from a minimum term of eight years, to a maximum term of 12 years. Timely notice of appeal was filed.

*Assignments of Error*

{¶ 13} Appellant sets forth the following four (4) assignments of error:

I: THE TRIAL COURT ERRED BY FAILING TO INSTRUCT THE JURY ON THE INFERIOR DEGREE OFFENSE OF AGGRAVATED ASSAULT.

II: A CONVICTION FOR AGGRAVATED ARSON CANNOT BE SUSTAINED BECAUSE THERE IS INSUFFICIENT EVIDENCE OF A SUBSTANTIAL RISK OF SERIOUS PHYSICAL HARM AS OPPOSED TO A SIGNIFICANT RISK OF SERIOUS PHYSICAL HARM.

III: THE CONVICTION FOR AGGRAVATED ARSON CANNOT BE SUSTAINED BECAUSE THE MANIFEST WEIGHT OF THE EVIDENCE DEMONSTRATES THAT [APPELLANT] DID NOT KNOWINGLY CREATE A SUBSTANTIAL RISK OF SERIOUS PHYSICAL HARM.

IV: THE TRIAL COURT COMMITTED PLAIN ERROR BY PERMITTING EXPERT TESTIMONY WITHOUT A WRITTEN REPORT BECAUSE WITHOUT THIS TESTIMONY INSUFFICIENT EVIDENCE OF A SUBSTANTIAL RISK OF SERIOUS PHYSICAL HARM WAS

PRESENTED TO SUPPORT A CONVICTION FOR AGGRAVATED

ARSON.

*First Assignment: Was it Plain Error to not Provide an Unrequested Jury Instruction on*

*Aggravated Assault, the Inferior Degree Offense to Felonious Assault?*

{¶ 14} In the first assignment of error, appellant argues that the trial court

committed plain error by not providing an unrequested jury instruction on the inferior

degree offense of aggravated assault.  We do not concur.

{¶ 15} As held by this court in *State v. Wimpey*, 2019-Ohio-4823, ¶ 13-15

(6th Dist.),

> Wimpey did not request an instruction on aggravated assault nor object to
> its omission from the jury instructions, and thus has forfeited all but plain
> error.  *State v. Booker*, 2013-Ohio-45, ¶ 18 (6th Dist.), citing *State v.*
> *Underwood*, 3 Ohio St.3d 12, 444 N.E.2d 1332 (1983). . .To find plain
> error, the defect in the trial court proceedings must be obvious and have
> affected the outcome of the trial.  *State v. Payne*, 114 Ohio St.3d 502, 2007-
> Ohio-4642, 873 N.E.2d 306, ¶ 16; Crim.R. 52(B).  Notice of plain error is
> to be taken with the utmost caution, under extreme circumstances, and only
> to prevent a manifest miscarriage of justice.  *State v. Lang*, 129 Ohio St.3d
> 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 108. . .An instruction on
> aggravated assault is appropriate when the evidence supports a conviction
> for felonious assault, but the assault resulted from serious provocation by
> the victim.  *State v. Morrow*, 2d Dist. Clark No. 2002-CA-37, 2002-Ohio-
> 6527, ¶ 8. . .Provocation, to be serious, must be reasonably sufficient to
> bring on extreme stress and the provocation must be reasonably sufficient
> to incite or arouse the defendant into using deadly force.  *State v. Coleman*,
> 2005-Ohio-318, ¶ 24 (6th Dist.).

*Absence of Serious Provocation Evidence*

{¶ 16} In applying the above-quoted governing legal principles to this case, the record is devoid of evidence of serious provocation by D.T. or R.T., preceding appellant's blowtorch attack upon D.T. at the gas station.

{¶ 17} On the contrary, the video footage and eyewitness accounts of the incident all consistently reflect appellant to have been the aggressor. In conjunction, appellant's own testimony regarding the encounter reflects the absence of serious provocation.

{¶ 18} In describing the encounter, appellant testifies,

> They're right at the stoplight [in their motor vehicle], you know, and I'm [walking] on the other side of the crosswalk. And the Rite Aid is right there, and literally my response was, fuck you. . .[R.T.] says fuck you, too. *[R.T.'s alleged statement] wasn't in an aggressive manner, it was, you know, like a comical kind of interaction. . . It was in a friendly manner like, hey, buddy, come here, hey, you know. . . so I turned around and I start walking up to the car door. . .* You know how people can be, they want to punk on you. I've been picked on my whole life. (Emphasis added).

{¶ 19} We have carefully reviewed the record of evidence, with scrutiny to the multiple video clips of the events and the trial transcripts, particularly as pertaining to the interactions of appellant with R.T. and D.T., prior to appellant's assault upon D.T. with a lit blowtorch.

{¶ 20} The record is devoid of evidence demonstrating that any actions of R.T. or D.T. prior to the incident could be construed as having caused sudden anger or rage in appellant, so as to arguably constitute serious provocation preceding the incident, such that the absence of a jury instruction on the inferior degree offense of aggravated assault

7.

constituted an obvious defect in the proceedings, affected the outcome, and was, therefore, plain error.

{¶ 21} On the contrary, the video clips consistently show D.T. and R.T. trying to avoid appellant, and protect themselves against appellant's unprovoked verbal and physical aggression towards them. Appellant's own testimony describes their interactions prior to the blowtorch attack upon D.T. as "comical" and "friendly". Given these facts and circumstances, we find no obvious defect, plain error in the trial court's failure to furnish an unrequested jury instruction on aggravated assault, given the absence of evidence of serious provocation of appellant preceding the incident. Accordingly, we find appellant's first assignment of error not well-taken.

*Second and Third Assignments of Error: Was the Aggravated Arson Conviction*

*Unsupported by Sufficient Evidence and Against the Manifest Weight of the Evidence?*

{¶ 22} In the second and third assignments of error, appellant argues that the aggravated arson conviction was not supported by sufficient evidence, and was against the manifest weight of the evidence. We are not persuaded.

{¶ 23} As set forth by this court in *State v. Costilla*, 2024-Ohio-3221, ¶ 44-45 (6th Dist.),

> Appellant challenges both the sufficiency and weight of the evidence. Sufficiency of evidence is a term of art for applying the legal standard to determine whether the evidence is legally sufficient to support the verdict as a matter of law. *State v. Manning*, 2019-Ohio-3405, ¶ 13 (6th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).
> The test for sufficiency is one of adequacy, or whether the evidence, if believed, can sustain the verdict as a matter of law. *Manning* at ¶ 12, citing *State v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, ¶ 132. The

8.

sufficiency standard applies to the prosecution's burden of production at trial. *State v. Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, ¶ 26.

The test of manifest weight of the evidence, on the other hand, applies to the prosecution's burden of persuasion. *Messenger* at ¶ 26. A challenge to a conviction based on the manifest weight of the evidence questions whether the trial court could find a greater amount of credible evidence was admitted at trial to sustain that decision than not. *Manning* at ¶ 41, citing *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, ¶ 75, citing *Thompkins* at 387. In reviewing a verdict against the manifest weight of the evidence, we give deference to the trial court's credibility determinations, and the testimony of a single witness, if believed, will support a conviction. *Manning* at ¶ 41-42, citing *Myers*, 2018-Ohio-1903, ¶ 140-141."

{¶ 24} As applied to the instant case, we note that appellant's sufficiency and manifest weight claim on appeal is limited to the aggravated arson conviction. R.C. 2909.02(A)(1), Ohio's aggravated arson, substantial risk of serious physical harm to person, statute, establishes, in relevant part, "No person, by means of fire or explosion, shall knowingly. . . Create a substantial risk of serious physical harm to any person other than the offender."

*Testimony of Eyewitness Hogan*

{¶ 25} At trial, the State first called eyewitness Arianna Hogan ("Hogan") to testify. On February 12, 2024, Hogan, an off-duty cashier at the gas station, present when the incident occurred, was there discussing her schedule with the station manager when she witnessed the incident.

{¶ 26} Upon direct inquiry, "So you get there to talk to your manager about hours. What happens?", Hogan testifies, "We were standing there in the doorway of the office and *I was looking towards the front door and that's when [appellant] came in with the*

9.

*torch and started to blowtorch the glass on the front door. . .so that's when I called 9-1-1. . .Two guys from outside [D.T. and R.T.] tried to walk up to the front door and [appellant] opened it and lit [D.T.] on fire, like the face*." (Emphasis added).

{¶ 27} Upon further direct inquiry, "[Did] you see the flame hit that guys face?", Hogan replies, "Yes." Upon inquiry, "So after that, what happens?", Hogan replies, "[Appellant] went fully outside and was arguing with them outside and was lighting the woodpile on fire." Thereafter, State's Exhibit 3, the recording of Hogan's 9-1-1 call, was played and admitted into evidence. Hogan then positively identified appellant as the individual that she witnessed on February 12, 2024, put a lit blowtorch against D.T.'s person.

*Testimony of Eyewitness Rahman*

{¶ 28} The State next called eyewitness Mohammad Rahman, a delivery driver present during the incident, to testify. Upon direct inquiry, "Do you recall being at the Ridi's [gas station] on Summit St. [on Februrary 12, 2024] and something unusual happening?", Rahman testified, "I arrived – I don't know what time it was. I think it was earlier in my route that day. I stepped out of the truck. . .I was stopped by [R.T. and D.T.] and they were telling me to watch out, there's a guy [coming] with a blowtorch. . . They were just warning me, hey, be careful, [appellant] has a blowtorch." Upon further inquiry regarding what he observed shortly thereafter, Rahman replied, "*I saw [appellant put] the blowtorch up to [D.T.'s] face. . .and then [D.T.'s] hair just went up [on fire]*." (Emphasis added).

10.

**{¶ 29}** Rahman thereafter positively identified appellant as the person he witnessed putting a lit blowtorch in D.T.'s face, and then setting his hair on fire, on February 12, 2024.

*Testimony of Eyewitness Celestino*

**{¶ 30}** The State next called eyewitness Christine Celestino ("Celestino") to testify. Upon direct inquiry, "Do you remember an incident that occurred on February 12, 2024, at the Ridi's gas station?", Celestino testified, "Yes. . .I was on my lunch hour [from a nearby insurance office] and I went [to Ridi's] to cash in a lottery ticket, and everything happened right in front of my vehicle as I was exiting the store. . .*As soon as I got in my car, I went to put my seatbelt on and I noticed [appellant] coming this way from behind the truck. . . with a blowtorch. . .[appellant] was lunging at [D.T. and R.T.]*." Upon further inquiry, "*Was it [the blowtorch] lit?*", Celestino replied, "*Yes.*" (Emphasis added).

*Testimony of Arson Investigator Brown*

**{¶ 31}** The State next called Kathryn Brown ("Brown"), an arson investigator with the City of Toledo, to testify. Brown positively identified appellant as the individual whom she observed in the back of the police cruiser when she arrived on the scene to investigate. Brown explained that she reviewed the video footage of the events from the gas station surveillance camera system in the course of her investigation.

**{¶ 32}** Upon direct inquiry, "And you observed [appellant] utilizing a blowtorch?", Brown replied, "Yes." Upon further inquiry, "Do you know what type of

11.

blowtorch [appellant] used?", Brown replied, "Yes.  It's a Burnsomatic MAP-Pro."  Upon direct inquiry, requesting Brown to read from the product information card, "Can you tell the jurors the maximum flame temperature?", Brown replied, "3600 degrees Fahrenheit." Upon direct inquiry, requesting Brown to read the warning language from the blowtorch product information card, Brown replied, "It has the danger symbol in red. It is extremely flammable, fire or explosion hazard, contents under pressure, carbon monoxide hazard, and then it has pictures of fire, it looks like an explosion into someone, and inhalation issues with a person's figure."  Upon direct inquiry, "*And after reviewing the surveillance video. . . Did you observe [appellant] go after the victims more than once with a [lit] blowtorch [Burnsomatic MAP-Pro]?*", Brown replied, "*Yes*."  (Emphasis added).

*Testimony of Victim D.T.*

{¶ 33} The State next called D.T., the victim whose face and hair appellant put the lit blowtorch against, to testify.  Upon direct inquiry, "What happens once you're at the [red] light?", D.T. testifies, "We see [appellant] on the left-hand side, he was just walking. We [saw] him walking at first, and then he looked at us in the car and he started approaching us with his torch. . . He just came at us with a torch on the window. . . He put it against the window."  Upon further inquiry regarding what occurred shortly thereafter at the gas station, D.T. replied,

> We're at the pump.  I get out of the car because I wanted to go inside to buy a beverage. . . I was coming [into the store], but [appellant] was right there at the door holding the door.  When I got a little closer as when he opened the door and pointed the torch at me."  Upon direct inquiry, "Was it lit?", D.T. replied, "*Yes, and he caught me a little bit in my face, so. . . I backed up from the door and ran back from him, then he pursued me to chase me. .*

*.I felt the heat pressure [from the lit blowtorch being held against him] and a little piece of my hair caught on fire.* (Emphasis added).

*Testimony of Victim R.T.*

{¶ 34} The State next called R.T. to testify. Upon direct inquiry, "You're stopped at a red light?", R.T. testifies, "We got stopped at a red light. A man with a blowtorch [appellant] comes to my driver side window and puts it on my window." Upon further inquiry as to what occurred shortly thereafter at the gas station, R.T. replied, "[Appellant] is in the store and [D.T.] is trying to get in the store. . .[Appellant] is holding the door and pointing the torch outside the door, not letting us in." Upon further inquiry regarding what occurred after appellant opened the door and put the lit blowtorch up against D.T., R.T. replied, "[D.T.'s] hair started smoking. . .I could see it. . .[D.T] is running towards me and his hair is smoking. . .[Appellant] goes back in the store, then he comes right back out chasing [D.T.] again. . . And he's coming towards both of us."

*Appellant's Testimony*

{¶ 35} Upon the State resting, appellant then testified on his own behalf. Appellant's lengthy testimony is largely incongruous and inscrutable. Appellant's testimony does directly acknowledge, but attempts to minimize, the racial epithets that he directed at the victims during the incident. To illustrate, at one point, appellant testifies that, in the course of the incident, "I started hearing [voices]. . . And they were laughing at me in my head. They're saying you just got punked by these dudes. . .I use a lot of slang in my vocabulary and that's how I talk with my friends. I'll say [the n-word].

That's how I talk. . . To be honest with you, though, the situation. . . It was race fueled, like these [] You know what I mean?"

{¶ 36} The balance of the testimony reflects appellant's position that, despite multiple eyewitnesses and video footage uniformly reflecting that appellant, unprovoked, attacked D.T. with a lit blowtorch, and appellant repeatedly hurled racial epithets towards the victims, appellant nevertheless perceives himself as the victim in this case. The record reflects otherwise.

{¶ 37} In applying the above-discussed sufficiency and manifest weight principles to the record of evidence in this case, the record reflects that considerable evidence was presented at trial, through the testimony of the three eyewitnesses, consistent with the victims' testimony, and as affirmed and bolstered by the 9-1-1 tape, gas station surveillance camera video footage, body camera video footage, and dash cam video footage, that on February 12, 2024, appellant, who had randomly encountered R.T. and D.T. at an intersection in Point Place, and placed a lit blowtorch against their car window, then saw them at a nearby gas station, placed himself directly in the path of D.T. at the entry to the gas station, then opened the door and thrust a lit blowtorch in D.T.'s face, then pursued D.T. outside, setting D.T.'s hair on fire with the lit blowtorch.

{¶ 38} We find that the evidence presented was sufficient to sustain the verdict of aggravated arson, in violation of R.C. 2909.02(A)(1), as a matter of law, given appellant's undisputed use of fire against D.T., via a lit blowtorch, knowingly creating a substantial risk of serious physical harm to D.T. The State satisfied the burden of production.

14.

{¶ 39} Likewise, and also based upon the above-detailed evidence, we find that the bulk of the evidence in the record weighed in favor of sustaining the conviction of aggravated arson, and the conviction was not against the manifest weight of the evidence. The testimony of a single witness, if believed, supported the conviction. The State satisfied the burden of persuasion.

{¶ 40} Wherefore, we find appellant's second and third assignments of error not well- taken.

*Fourth Assignment: Was Brown's Testimony Plain Error Without A Written Report?*

{¶ 41} In the fourth assignment of error, appellant argues that the trial court committed plain error by permitting arson investigator Brown to testify without submitting a written report, in violation of Crim.R. 16(K). We do not concur.

{¶ 42} We first note that Brown was not qualified by the State as an expert witness, did not testify as an expert witness, and her testimony drew no objection.

{¶ 43} Accordingly, as held in *State v. Jones*, 2018-Ohio-498, ¶ 110-111 (8th Dist.),

> Evid R. 701 governs opinion testimony by lay witnesses and provides as follows: If the witness is not testifying as an expert, the witness' testimony in the form of opinion or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.
> The Ohio Supreme Court has addressed the issue of lay witnesses testifying on issues generally reserved for expert testimony, stating the following: It is consistent with [the] emerging view of Evid.R. 701 that courts have permitted lay witnesses to express their opinions in areas in which would ordinarily be expected that an expert must be qualified under Evid.R. 702. . .Although these cases are of a technical nature in that they allow lay

15.

opinion testimony on a subject outside the realm of common knowledge, they still fall within the ambit of the rule's requirement the lay witnesses' opinion be rationally based on first-hand observations and helpful in determining a fact in issue. These cases are not based on specialized knowledge within the scope of Evid.R. 702, but rather are based on a layperson's personal knowledge and experience. *State v. McKee*, 91 Ohio St.3d 292, 296-297 (2001).

{¶ 44} As applied to this case, Brown's testimony established that she was a former firefighter, and currently employed as an arson investigator. Brown further testified that on February 12, 2024, she arrived on-site shortly after the incident in order to conduct an arson investigation, spoke with the eyewitnesses, reviewed the gas station surveillance camera video footage of the event, and examined the blowtorch used by appellant during the incident.

{¶ 45} As such, we find that the record shows that Brown's testimony was rationally based upon her above-detailed perceptions.

{¶ 46} In conjunction, Brown's testimony, reading from the blowtorch product specification sheet, that the flame emitted reaches a temperature of 3600 degree Fahrenheit, and that the exposure of the human body to such "extreme heat" carries a risk of "disfigurement" falls within the realm of common knowledge, does not require specialized knowledge, and is helpful to an understanding of the testimony or the determination of a fact in issue.

{¶ 47} Based upon the foregoing, we find that Brown's testimony was proper under Evid.R. 701, and that the presentation of the testimony, without objection, did not constitute an extreme circumstance of an obvious defect in the proceedings, arguably

16.

affecting the outcome. Appellant has failed to demonstrate that the disputed testimony constituted plain error. We find appellant's fourth assignment of error not well-taken.

{¶ 48} On consideration whereof, the judgment of the Lucas County Court of Common Pleas is hereby affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.

Thomas J. Osowik, P.J.          _____
                                                JUDGE
Gene A. Zmuda, J.

Myron C. Duhart, J.                _____
CONCUR.                                       JUDGE

                                      _____
                                                JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.